United States District Court
Southern District of Texas

**ENTERED**

April 23, 2024

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAVIER TAPIA, Individually and as personal representative of THE ESTATE OF A.W.T., and JENNIFER WELBORN, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-23-0042 |
| UNION PACIFIC RAILROAD CO. and JOHN DOE, | § § § | |
| Defendants. | § § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Javier Tapia, individually and as personal representative of The Estate of A.W.T., and Jennifer Welborn ("Plaintiffs") filed this action against Union Pacific Railroad Company ("UPRC") and John Doe (collectively, "Defendants").[1]  Pending before the court is Plaintiffs' Motion for Leave to Amend the Complaint ("Plaintiffs' Motion to Amend") (Docket Entry No. 36).  Plaintiffs seek to add premises liability and gross negligence claims against the City of Houston ("the City") and Memorial Park Conservancy,

---

[1]Plaintiffs' Original Petition ("Original Complaint"), Exhibit 2 to Notice of Removal, Docket Entry No. 1-2, p. 1. Plaintiffs also named "Union Pacific Corporation" as a defendant but have since voluntarily dismissed it from the action.  <u>Id.</u>; Order, Docket Entry No. 21.  For purposes of identification, all page numbers refer to the pagination imprinted at the top of the page by the court's Electronic Case Filing ("ECF") system.

Inc. ("the Conservancy").[2]  Because the City and the Conservancy are citizens of Texas, granting Plaintiffs' Motion to Amend would destroy diversity jurisdiction and require remand of the action to state court.[3]  For the reasons stated below, Plaintiff's Motion to Amend will be granted, and this action will be remanded to the 215th Judicial District Court of Harris County, Texas.

## I.  Background

### A.  Procedural History

On December 12, 2022, Plaintiffs brought this action against Defendants in the 215th Judicial District Court of Harris County, Texas.[4]  Plaintiffs alleged negligence, negligence per se, and gross negligence claims against Defendants based on the death of their daughter Avery Welborn Tapia.[5]  On January 6, 2023, UPRC removed the action to this court on the basis of diversity

---

[2]Plaintiffs' [Substitute] First Amended Complaint ("Substitute FAC"), Exhibit 1 to Supplement to Plaintiffs' Motion for Leave to Amend the Complaint ("MTA Supplement"), Docket Entry No. 40-1, p. 3 ¶¶ 5-6, pp. 12-15.

[3]Plaintiffs' Motion to Amend, Docket Entry No. 36, p. 14 ¶ I. ("When, as here, a plaintiff seeks to join defendants that would destroy diversity jurisdiction . . ."); Union Pacific's Response to Plaintiffs' Motion for Leave to File Amended Complaint ("UPRC's Response"), Docket Entry No. 42, p. 8 ("Plaintiffs have filed a motion for leave to amend their complaint to name two non-diverse defendants and thus destroy diversity jurisdiction, thereby triggering a remand to state court.").

[4]Citation Corporate, Exhibit 1 to Notice of Removal, Docket Entry No. 1-1, p. 4.

[5]Complaint, Exhibit 2 to Notice of Removal, Docket Entry No. 1-2, pp. 4-5 ¶ 15.

jurisdiction.[6]   On January 30, 2023, UPRC filed a motion for summary judgment.[7]   On March 7, 2023, the court granted UPRC's MSJ and entered a Final Judgment dismissing the action.[8]   The Fifth Circuit vacated the Final Judgment and remanded the case, effective March 4, 2024.[9]

Plaintiffs filed the Motion to Amend on March 6, 2024, UPRC responded, and Plaintiffs replied.[10]   Plaintiffs seek to file the Substitute FAC.[11]

**B.   The Substitute FAC**

The Substitute FAC alleges in relevant part:

10. In the mid-afternoon of November 15, 2022, 17-year-old Avery Tapia was struck and killed by a

---

[6]Notice of Removal, Docket Entry No. 1, pp. 2-3 ¶¶ 3-5. According to the Notice of Removal, UPRC is a citizen of Delaware and Nebraska, and Plaintiffs are citizens of Texas.  Id. ¶ 5.  The court does not consider the citizenship of fictitiously named defendants such as John Doe.  28 U.S.C. § 1441(b)(1); Weaver v. Metropolitan Life Insurance Co., 939 F.3d 618, 623 (5th Cir. 2019).

[7]Union Pacific Railroad Company's Motion for Summary Judgment and Supporting Brief ("UPRC's MSJ"), Docket Entry No. 17.

[8]Memorandum Opinion and Order, Docket Entry No. 24, p. 9; Final Judgment, Docket Entry No. 25.

[9]Judgment, Docket Entry No. 30, pp. 1-2.

[10]Plaintiffs' Motion to Amend, Docket Entry No. 36; UPRC's Response, Docket Entry No. 42; Plaintiffs' Reply in Support of Their Motion for Leave to Amend the Complaint ("Plaintiffs' Reply"), Docket Entry No. 43.

[11]Plaintiffs' Motion to Amend attached Plaintiffs' First Amended Complaint, but Plaintiffs later supplemented with the Substitute FAC, changing an allegation about where Avery and her friend parked in Memorial Park.  Compare Plaintiffs' First Amended Complaint, Exhibit 1 to Plaintiffs' Motion to Amend, Docket Entry No. 36-1, p. 5 ¶ 17, p. 6 ¶ 27 with Substitute FAC, Exhibit 1 to MTA Supplement, Docket Entry No. 40-1, p. 5 ¶¶ 17, 24.

fast-moving Union Pacific train running through Memorial Park in Houston.

11.   Memorial Park is one of the largest urban parks in the United States.  Spanning some 1,500 acres, the park is nearly twice the size of New York City's Central Park and is visited by some four million people every year, and some ten thousand people every day.  The Park is crisscrossed with some 30 miles of trails used by cyclists, walkers, runners, and others.

12.   The City owns and controls Memorial Park.

13.   The Conservancy operates, maintains, and controls Memorial Park, including the locations at issue in this lawsuit.

14.   . . . [A] set of active railroad tracks runs north-south through the park.

. . .

17.   After picking up Avery at her home, Avery's friend drove the two to Memorial Park, where they wanted to go walking.  They parked along West Memorial Loop Drive.

. . .

19.   . . . Union Pacific owned, possessed, occupied, and controlled the tracks.

20.   The Conservancy's employees and administrators monitored, operated, and maintained the park grounds. They observed that park pedestrians (adults and minors) could freely access, and in fact did habitually access, the active train tracks.  As a result, the Conservancy knew of the dangers created by open pedestrian access, without warnings, to the tracks.

21.   The City also monitored the park grounds through its relationship with the Conservancy and by other means, including patrols by the City of Houston Police Department.  City officials were aware that pedestrians habitually accessed the tracks, and of the extreme danger the active tracks presented to those pedestrians.

22.   Unbeknownst to Avery and many other pedestrians, Union Pacific personnel periodically drove its trains on the tracks. . . .

-4-

23. At any rate, Avery had never before been to this location. She did not know the train tracks were active. Instead, it appeared that the tracks were abandoned.

24. After parking along West Memorial Loop Drive, Avery and her friend followed a foot-trail onto the wide-open train tracks, where they began walking a few feet south along the tracks.

25. No signs warned that trains actively traveled the tracks.

26. Nor did any fencing or barriers prevent pedestrian access to the tracks.

27. As they walked south, the tracks crossed over the multi-lane Memorial Drive on two bridges.

28. Avery and her friend stopped to draw chalk on one of these bridges.

29. Defendants were aware that park pedestrians—and school-aged children in particular—habitually accessed the tracks on these bridges and the surrounding area.

30. Avery and her friend reached the area around the geographic coordinates 29°46'07.9"N 95°26'53.6"W. This is a Google Maps image of the location:



31. A power generator, containing abundant graffiti, is located at this location. Foot trails show open pedestrian access to this location.

32.   Avery and her friend then stopped to sit and talk.

33.   Again, at no point were there any fencing or other barriers preventing Avery and her friend from reaching this location.   Nor, again, were there any signs that warned of active train lines.

34.   Here as well, Defendants knew of the dangers created by open pedestrian access, without warnings, to the active train tracks around this location.

35.   Had there been any such warning, Avery would never have walked along the tracks, much less reached this location.

36.   Unbeknownst to the girls, a Union Pacific train traveled northeast toward them.   The train moved at nearly 46 miles per hour as it turned through a tree-lined curve.[12]

. . .

41.   Both girls were in a state of terror as the fast-moving train rapidly approached.

42.   Avery's friend scrambled to safety and dodged the train by mere feet.

43.   Avery ran towards the opposite side of the tracks. She panicked with uncertain steps over uneven terrain, her arms flailing to steady herself.   She never cleared the train's path.

44.   Disoriented and terrified—and never once able to glance back at the train—she finally weaved unsteadily back towards the train's path.

45.   The train then struck and crushed Avery to death.

. . .

49.   On November 18, 2023, Ms. Welborn (accompanied by a small number of friends and family) met with Shellye Arnold, CEO of the Conservancy, to discuss the tragedy.

---

[12]Substitute FAC, Exhibit 1 to MTA Supplement, Docket Entry No. 40-1, pp. 4-7 ¶¶ 10-36.

50.   Ms. Welborn immediately complained to Ms. Arnold (whose office was inside the Cullen Running[] Trail[s] Center) that there was no fencing or barriers prohibiting access to the train tracks, or any warnings of the active train tracks, at either location.

51.   Ms. Welborn (and those accompanying her) went with Ms. Arnold on a golf cart, where they traveled to the location of Avery's death.

52.   Thinking not only of Avery but also of other children walking through Memorial Park, Ms. Welborn once more voiced her concern with the lack of safety measures preventing pedestrian access and the lack of active warnings.[13]

The Substitute FAC alleges negligence, negligence per se, premises liability, and gross negligence claims against UPRC and premises liability and gross negligence claims against the City and the Conservancy.[14]

Plaintiffs' premises liability claim alleges:

78.   Defendants knew of the dangers created by open pedestrian access, without warnings, to the active train tracks around these locations.

79.   Defendants created a condition in those areas that posed an unreasonable risk of harm — i.e., the risk of death or serious injury due to active trains traveling up to 60 miles per hour (or more) — and Defendants had actual knowledge of that condition.

80.   But Avery and her friend did not.  Indeed, in the absence of any warning sign or barrier — coupled with the tracks' proximity to the park's trails, and obvious frequent use by pedestrians — confirms that the tracks may have reasonably appeared abandoned and no longer dangerous.

---

[13]Id. at 7-8 ¶¶ 41-52.

[14]Id. at 9-10, 12, 14.

81. Defendants were aware of the tracks' public-park location, the park's trails and parking lots leading directly to the incident site, and abundant graffiti at the location where Avery was killed.  Defendants also were aware that pedestrians, including school-aged children, regularly accessed these locations.

82. Because of that and other evidence, Defendants knew that pedestrians in Memorial Park habitually accessed their train tracks, and they acquiesced to that near-daily reality.

83. Avery was an invitee who entered Defendants' premises with Defendants' knowledge and for Defendants' benefit.  Defendants had a duty to either warn Avery of this unreasonably dangerous condition or make the unreasonably dangerous condition reasonably safe. Defendants breached this duty by failing to warn Avery of this known unreasonably dangerous condition and by failing to make that condition reasonably safe. Defendants did not, for example, post a clear sign warning of active train lines, install a simple gate, or provide an enclosed fence.

84. Even assuming the girls were trespassers, Defendants still owed them a duty to warn. Defendants knew that trespassers frequented the area because of the tracks' public-park location, the trails leading directly to the incident site, the abundant graffiti at the incident location, and further evidence.  Defendants thus owed Avery and her friend a duty to warn of the dangerous condition it created with its active train lines or take other action for their protection.

85. Yet Defendants gave no such warnings and took no such action.  They did not, for example, post a clear sign, install a simple gate, or provide an enclosed fence.  But if Defendants had taken any of those actions, Avery would still be alive today, because she and her friend would have either avoided the area entirely or taken significantly greater precautions.  In short, Defendants' breach proximately caused Avery's death . . .[15]

Plaintiffs' gross negligence claim against the City and the Conservancy alleges:

---

[15]Id. at 12-14 ¶¶ 78-85.

87.  Defendants   had   actual   knowledge   that   park
pedestrians  could  freely  access,  and  in  fact  did
habitually access, the locations where Avery began her
walk and where she was killed.

88.  Defendants  also  had  actual  knowledge  of  the
objectively extreme risk posed by the active train lines
cutting through those locations—i.e., the risk of being
hit and killed by a train.

89.  Defendants had a duty to warn of that extreme risk,
or  to  make  the  unreasonably  dangerous  condition
reasonably  safe  by,  for  example,  posting  a  clear  sign
warning of active train lines, installing a simple gate,
or providing an enclosed fence.

90.  But  Defendants  gave  no  such  warnings  and  took  no
such  action,  and  instead  proceeded  with  conscious
indifference  toward  the  safety  of  others.

. . .

97.  As a result of Defendants' gross negligence, Avery
suffered  horrific  pain  and  death.   Plaintiffs  also
suffered the damages identified in Part E below.[16]

## II.  <u>Legal Standard</u>

"If  after  removal  the  plaintiff  seeks  to  join  additional

defendants whose joinder would destroy subject matter jurisdiction,

the court may deny joinder, or permit joinder and remand the action

to the State court."  28 U.S.C. § 1447(e).  The parties agree that

because the City and the Conservancy are citizens of the same state

as Plaintiffs, granting Plaintiffs' Motion to Amend would destroy

the court's subject matter jurisdiction.[17]  They also agree that the

---

[16]<u>Id.</u> at 14-15 ¶¶ 87-97.

[17]Plaintiffs'  Motion  to  Amend,  Docket  Entry  No.  36,  p.  14
("When,  as  here,  a  plaintiff  seeks  to  join  defendants  that  would
destroy  diversity  jurisdiction  .  .  .");  UPRC's  Response,  Docket
(continued...)

court's decision whether to allow the amendment is guided by the factors enumerated in <u>Hensgens v. Deere & Co.</u>, 833 F.2d 1179, 1182 (5th Cir. 1987):

> [T]he court should consider the extent to which the purpose of the amendment is to defeat federal jurisdiction, whether plaintiff has been dilatory in asking for amendment, whether plaintiff will be significantly injured if amendment is not allowed, and any other factors bearing on the equities.

<u>Id.</u> at 1182.[18]

In determining whether the amendment's purpose is to defeat federal jurisdiction the court considers whether the amendment states a plausible claim against the proposed in-state defendants. <u>Guijarro,</u> 39 F.4th at 315 ("The plaintiff's failure to state a plausible claim against a proposed defendant is evidence of the amendment's improper purpose and sufficient reason to deny leave to amend.").[19] Courts also consider whether the plaintiff knew of the proposed defendant's identity prior to removal. <u>See Martinez v. Holzknecht,</u> 701 F. Supp. 2d 886, 889 (S.D. Tex. 2010).

---

[17](...continued)
Entry No. 42, p. 8 ("Plaintiffs have filed a motion for leave to amend their complaint to name two non-diverse defendants and thus destroy diversity jurisdiction, thereby triggering a remand to state court."); <u>see also</u> 28 U.S.C. § 1332(a).

[18]<u>See also Guijarro v. Enterprise Holdings, Inc.,</u> 39 F.4th 309, 315 n.5 (5th Cir. 2022) (quoting the <u>Hensgens</u> factors).

[19]<u>See also Tillman v. CSX Transportation, Inc.,</u> 929 F.2d 1023, 1029 (5th Cir. 1991) ("In allowing the joinder, the trial court correctly tempered its discretion with the standard established by [<u>Hensgens</u>], finding that the plaintiff had a valid cause of action against the DOTD, so the principal purpose of the amendment was not to defeat federal jurisdiction.").

-10-

### III.  __Analysis__

Plaintiffs argue that the primary purpose of their amendment is to allege valid claims against the City and the Conservancy, that denying the amendment would prejudice them with parallel proceedings and the possibility of inconsistent results, and that they have not been dilatory.[20]  UPRC responds that the purpose of Plaintiffs' amendment is to defeat federal jurisdiction, that denying the amendment will not prejudice Plaintiffs, that Plaintiffs have been dilatory in seeking amendment, and that this court is familiar with the case and therefore best positioned to efficiently resolve the claims against UPRC.[21]

### A.    Purpose of the Amendment

Plaintiffs argue that the primary purpose of their amendment is to assert valid claims against the City and the Conservancy.[22] UPRC responds that Plaintiffs' proposed claims are not viable under Texas law.  In particular, UPRC argues that there is no duty to warn a licensee of railroad tracks because they are an open and obvious danger, that Plaintiffs' claims against the City are barred by sovereign immunity, and that the City and the Conservancy cannot be liable for dangers on UPRC's property.[23]  UPRC also argues that

---

[20]Plaintiffs' Motion to Amend, Docket Entry No. 36, pp. 14-16.

[21]UPRC's Response, Docket Entry No. 42, pp. 9-10.

[22]Plaintiffs' Motion to Amend, Docket Entry No. 36, p. 18.

[23]UPRC's Response, Docket Entry No. 42, pp. 12, 14, 15.

Plaintiffs' improper purpose is shown by the fact that they knew of the City and the Conservancy before filing the action.[24]  Plaintiffs respond that the tracks were not an open and obvious danger because they appeared abandoned, that their claims against the City fall within a sovereign immunity waiver, and that UPRC's ownership of the tracks does not preclude premises liability or gross negligence claims against the City and the Conservancy.[25]

1.   Open and Obvious Dangers

UPRC argues that, regardless of whether Avery was a licensee or trespasser, Plaintiffs' premises liability and gross negligence claims fail because railroad tracks are an open and obvious danger under Texas law.[26]  Plaintiffs respond that there is no categorical rule that railroad tracks are an open and obvious danger and that the tracks at issue were not an open and obvious danger because they appeared abandoned.[27]

"The nature of [a landowner's] duty owed depends on whether the plaintiff is an invitee, licensee, or trespasser." Watanabe v. Summit Path Partners, LLC, 650 S.W.3d 112, 125 (Tex. App.—Houston [1st Dist] 2021).  A non-paying user of a public park is considered a licensee.  Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a) ("[I]f

---

[24]Id. at 11.

[25]Plaintiffs' Reply, Docket Entry No. 43, pp. 5-7.

[26]UPRC's Response, Docket Entry No. 42, p. 12.

[27]Plaintiffs' Reply, Docket Entry No. 43, p. 9-13.

a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises."). "The duty owed to a licensee . . . requires that 'a landowner not injure a licensee by willful, wanton or grossly negligent conduct, and that the owner use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not.'" Sampson v. University of Texas at Austin, 500 S.W.3d 380, 385 (Tex. 2016) (quoting State Department of Highways & Public Transportation v. Payne, 838 S.W.2d 235, 237 (Tex. 1992)).  But landowners "have no duty to warn or protect against conditions that are open or inherent, and thus obvious[.]"  Suarez v. City of Texas City, 465 S.W.3d 623, 627 (Tex. 2015).  "Whether a danger is open and obvious is a question of law determined under an objective test." Los Compadres Pescadores, L.L.C. v. Valdez, 622 S.W.3d 771, 788 (Tex. 2021).  "The question is whether the danger is 'so open and obvious that as a matter of law [the plaintiff] will be charged with knowledge and appreciation thereof.'"  Id.  "To properly apply an objective test, we must consider the 'totality of' the 'particular' circumstances the plaintiff faced."  Id. at 788-89.

UPRC cites two federal cases applying Texas law that held railroad tracks were open and obvious dangers.  In Barnes v. Kansas City Southern Railway Co., Civil Action No. 4:14-68, 2016 WL 4801511 (S.D. Tex. Feb. 19, 2016), two persons were struck by a

-13-

train at a public crossing.  Id. at *1.  One of the persons testified that they were both aware of the train's approach before they attempted to cross the tracks.  Id.  The court held that the duty to warn licensees of unknown dangers did not apply, reasoning that "[i]gnorance cannot be claimed for obvious danger such as a railroad crossing."  Id. at *3.  In Berry v. Union Pacific Railroad Co., Civil Action No. H-22-331, 2022 WL 2292884 (S.D. Tex. June 24, 2022), a person entered the defendant's "rail yard through an opening that was not at a gate or other intended entrance."  Id. at *1.  He was "struck by a rail car and subsequently run over, while in the process of walking through the yard and over a track." Id. (internal quotation marks omitted).  The court dismissed with prejudice the plaintiff's negligence and gross negligence claims "to the extent they are based on Union Pacific's failure to fence, put up signs, or maintain the rail yard[,]" reasoning that "[r]ailroad tracks are an obvious condition of a railroad, and there is no general duty to warn of their presence because they are an obvious danger."  Id. at *4 (citing Barnes, 2016 WL 4801511, at *3).  Based on these opinions, UPRC argues that "neither a land-owner nor occupier has a duty to warn or protect against the presence of railroad tracks[.]"[28]

Plaintiffs respond that these two opinions did not hold that railroad tracks are always an open and obvious danger as a matter

---

[28]UPRC's Response, Docket Entry No. 42, p. 13.

of law.[29]   Instead, the open-and-obvious inquiry must be based on the particular facts of a case.[30]   Plaintiffs analogize their allegations to two Texas Supreme Court cases.   In <u>Los Compadres Pescadores</u> the plaintiffs were pouring underground concrete pilings to support a building foundation.   622 S.W.3d at 777.   They were doing so underneath a power line that — unbeknownst to the plaintiffs — was energized.   <u>Id.</u> at 778, 789.   As one of the plaintiffs was placing a long piece of rebar into a piling hole, it made contact with the power line, electrocuting the plaintiffs. <u>Id.</u> at 778.   The court rejected the argument that the danger was open and obvious:

> Based on the evidence in this record, we agree that the <u>presence</u> of the power line was open and obvious. . . . And to be sure, "there is inherent danger in working around live wires," and those engaged to perform such work should be expected to "realize the danger of accidental contact with the charged line" or "to take reasonable measures to protect themselves." . . . But we cannot say that under these particular circumstances, the fact that the power line was energized and thus dangerous was open and obvious as a matter of law.

<u>Id.</u> at 789 (emphasis in original) (internal citations omitted). The court emphasized the plaintiffs' testimony that they were not told that the lines were energized, that their supervisor had stated that he had contacted the electric company and cut off the power, and that power lines were always de-energized when they worked for the defendant.   <u>Id.</u>   The court also cited a Texas

---

[29]Plaintiffs' Reply, Docket Entry No. 43, p. 9.

[30]<u>Id.</u> at 9-10 (citing <u>Los Compadres</u>, 622 S.W.3d at 788).

statute requiring the person "'responsible for the work'" to ensure that power lines were de-energized. Id.

In County of Cameron v. Brown, 80 S.W.3d 549, 553 (Tex. 2002), a driver was traveling on a causeway when he lost control of his truck, which struck the median and turned on its side.  Another vehicle crashed into the truck while the driver was trying to escape, and he died at the scene.  Id.  The causeway curves, has narrow shoulders, rises at least 85 feet above a bay below, and has a concrete median that prevents drivers from turning around.  Id. At the time of the accident a block of streetlights on the causeway was not functioning, including the section where the accident occurred.  Id.  The driver's survivors brought a premises liability claim against the Texas Department of Transportation and Cameron County.  Id.  The defendants argued that the allegedly dangerous condition — "'darkness at night'" — was open and obvious. Id. at 555.  But the court stated that "the dangerous condition alleged is not merely 'darkness' but a failed block of artificial lighting that caused a sudden, unexpected and significant transition from light to darkness."  Id. at 558.  The court also stated that "[o]n the evening in question, the causeway was lit at the point of entry, but there was no illumination further along the causeway at the accident scene.  The relevant inquiry is whether the lighting failure was open and obvious to motorists entering the causeway, because that is the point at which they could choose to avoid the condition or otherwise protect themselves."  Id.

-16-

Therefore the court could "[]not say that sudden darkness created by the failed lighting at the accident scene was a danger open and obvious[.]" Id.

Plaintiffs argue that the hazards in Los Compadres and Brown are similar to the active tracks where Avery died. Plaintiffs argue that as in Los Compadres, "the mere 'presence' or 'visibility' of railroad tracks is not enough to establish an open and obvious danger because the visible tracks were 'only one component of the danger[.]'"[31] Plaintiffs argue that the tracks appeared abandoned because "abundant graffiti marked the tracks where Avery was struck; trails directly invited 'open pedestrian access' to that location; and pedestrians 'habitually accessed the tracks on these bridges and the surrounding area[.]'"[32]

---

[31]Plaintiffs' Reply, Docket Entry No. 43, p. 11 (quoting Los Compadres, 622 S.W.3d at 790).

[32]Id. (quoting the Substitute FAC, Exhibit 1 to MTA Supplement, Docket Entry No. 40-1, p. 5). Plaintiffs also cite the Affidavit of Grace Davis ("Davis Aff."), who was with Avery when she died. Davis Aff., Exhibit 2 to Supplemental Response to Union Pacific's Motion for Summary Judgment and Motion for Continuance, Docket Entry No. 41-2. Davis states in relevant part:

> 10.   Before that day, many people I knew were aware of the location on the tracks where Avery and I were. Probably hundreds of people, including many of my peers, went to those tracks and took photos and videos, mostly for social media like TikTok. My peers and I viewed the location as a peaceful place in the park.
>
> 11.   Neither Avery nor I had any idea that trains traveled those tracks. We thought the tracks were abandoned, and they appeared abandoned to us.

(continued...)

Taking Plaintiffs' allegations as true, pedestrian trails connect to the tracks in the middle of a bustling urban park — unimpeded by any signage, gates, or fencing. These circumstances, combined with the names on the bridge's guardrail and the adjacent graffiti, could give a visitor (especially a 17-year-old) the false impression that the tracks were a part of the park and no longer in use. The court cannot say with confidence that a Texas court would reject Plaintiffs' abandoned-tracks theory and hold as a matter of law that the active railroad tracks were an open and obvious danger.[33]

To the extent UPRC argues that the approaching train itself was an open and obvious danger, the court is not persuaded. Similar to <u>Brown,</u> it is not clear that Avery had a sufficient opportunity to avoid the danger once she was on the tracks. The train would not have been visible until it rounded the nearby

---

[32] (...continued)

. . .

13.    In speaking with some of my peers since the incident, many of them also had no idea that trains travel those tracks. Like me, they also thought they were abandoned.

14.    . . . Many people wrote their names on the bridge's guardrail. . . .

<u>Id.</u> at 3 ¶¶ 10-11, p. 4 ¶¶ 13-14.

[33]The court need not resolve definitively whether the alleged danger was open and obvious. The important question for this motion is whether Plaintiffs' proposed claims are <u>plausible. See Guijarro,</u> 39 F.4th at 315.

curve, and only if the girls had been looking in that direction, and the train's horn was not blown until seconds before Avery was struck.[34]

### 2.   Sovereign Immunity

UPRC argues that Plaintiffs' claim against the City would fail because it does not fall within the Texas Tort Claims Act (TTCA) waiver of sovereign immunity.[35]  In particular, UPRC argues that the decision whether or not to post signs or erect a fence near railroad tracks is a discretionary decision for which the City cannot be held liable.[36]  Plaintiffs respond that the City has a nondiscretionary duty to comply with the applicable standard of care and, in the alternative, that the City's failures were maintenance defects, for which sovereign immunity is waived.[37] Plaintiffs also argue that the Conservancy is not a government entity and therefore not entitled to sovereign immunity.[38]

The TTCA waives sovereign immunity for "death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the

---

[34]Substitute FAC, Exhibit 1 to MTA Supplement, Docket Entry No. 40-1, p. 7 ¶ 40.

[35]UPRC's Response, Docket Entry No. 42, p. 14.

[36]Id. at 14.

[37]Plaintiffs' Reply, Docket Entry No. 43, pp. 13-15.

[38]Id. at 15.

claimant according to Texas law." Tex. Civ. Prac. & Rem. Code § 101.021(2). The TTCA contains an exception to this waiver for discretionary decisions. Id. § 101.056(2) ("This chapter does not apply to a claim based on . . . a governmental unit's decision not to perform an act or on its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.").

Plaintiffs argue that premises-liability law imposes a nondiscretionary duty on the City.[39] But the Texas Supreme Court has made clear that the discretionary-function exception can bar premises-liability claims against the government. Christ v. Texas Department of Transportation, 664 S.W.3d 82, 88 (Tex. 2023) ("A claimant seeking to invoke the [TTCA]'s waiver of immunity for premises liability must also demonstrate that the governmental unit's acts were not discretionary.").

Plaintiffs also argue that the City's failure was not in its design of the park (which is a discretionary function) but in its maintenance (which is nondiscretionary).[40] Although some courts have relied on this distinction, the Texas Supreme Court has rejected "a 'sharp line between "design" and "maintenance," under which anything on the "maintenance" side of the line is not covered by the discretionary function exception[.]'" City of Austin v.

---

[39]Plaintiffs' Reply, Docket Entry No. 43, pp. 13-14.

[40]Id. at 14-15.

-20-

Quinlan, 669 S.W.3d 813, 820 (Tex. 2023). The court has held that "decisions about installing safety features are discretionary decisions for which the State may not be sued." Texas Department of Transportation v. Ramirez, 74 S.W.3d 864, 867 (Tex. 2002) (per curiam). A Texas court would therefore likely hold that the City is entitled to sovereign immunity. However, UPRC does not argue that the Conservancy would be entitled to sovereign immunity.

### 3. The Location of the Premises Defect

UPRC next argues that Plaintiffs' claims against the City and the Conservancy are not viable because the alleged danger was on UPRC's property — not on the City's or the Conservancy's.[41] Plaintiffs respond that the City's and the Conservancy's failures were also dangerous and that they proximately caused Avery's death.[42]

In general, "'to prevail on a premises liability claim a plaintiff must prove that the defendant possessed — that is, owned, occupied, or controlled — the premises where injury occurred." Hyde v. Hoerauf, 337 S.W.3d 431, 436 (Tex. App.—Texarkana 2011). But there are exceptions. For example, a "person who has created the dangerous condition may be liable even though not in control of the premises at the time of injury." City of Denton v. Page, 701 S.W.2d 831, 835 (Tex. 1986).

---

[41]UPRC's Response, Docket Entry No. 42, p. 15.

[42]Plaintiffs' Reply, Docket Entry No. 43, pp. 15-16.

UPRC cites <u>McCullough v. City of Pearsall</u>, No. 04-08-00395-CV, 2009 WL 331886, at *2 (Tex. App.—San Antonio Feb. 11, 2009), in which a child was struck by a train.  The child walked on a paved sidewalk in a vacant lot owned by the city, which eventually became a trail that led up to the railroad's property.  <u>Id.</u> at *1.  The child's parents brought a premises liability claim against the city, arguing that the trail and unmarked crossing were dangerous. <u>Id.</u> at *3.  The court stated that "to make a claim based on a condition of real property, a plaintiff must complain of something defective or inadequate about the property itself[.]"  <u>Id.</u>  The court rejected the parents' claim, reasoning that "at most the City's paved sidewalk that eventually became a trail that led to [the Railroad's property], and on which the McCulloughs' daughter was killed, did no 'more than furnish the condition that [made] the injury possible.'"  <u>Id.</u>

<u>McCullough</u> bears some similarity to this case since Avery was struck by a train on UPRC's property after following a path on the City's property.  But Plaintiffs' allegations go beyond arguing that a park trail provided access to UPRC's property.  <u>McCullough</u> did not address Plaintiffs' theory that conditions on the City's and the Conservancy's land[43] made the tracks dangerous by giving the false impression that they were abandoned.  It is unclear if this

---

[43]Plaintiffs do not allege that the Conservancy owns Memorial Park but instead alleges that it is liable because it "operated, managed, maintained, and/or controlled" the park.  <u>See</u> Substitute FAC, Exhibit 1 to MTA Supplement, Docket Entry No. 40-1, p. 12 ¶ 75.

can be characterized as a danger on the park land itself, but the Conservancy may be liable for a defect on land it does not own or control if it caused the danger. See Page, 701 S.W.2d at 835. The court is persuaded that Plaintiffs can allege a plausible claim against the Conservancy.

### 4.   The Timing of Plaintiffs' Amendment

UPRC argues that the timing of Plaintiffs' amendment reveals that their purpose is to defeat federal jurisdiction.[44]   In particular, UPRC argues that Plaintiffs knew of the City and the Conservancy soon after Avery's death but chose not to add them as defendants prior to filing the action.

Courts consider whether the plaintiff knew of the non-diverse defendant before filing the action or removal. See Martinez, 701 F. Supp. 2d at 889. But the court is wary of inferring too much from Plaintiffs' decisions about who to sue in the months immediately following their daughter's tragic death. The court is persuaded that any inference from the amendment's timing is outweighed by Plaintiffs' ability to allege a plausible claim against the Conservancy. The court concludes that the primary purpose of the amendment is to allege a plausible claim against the non-diverse defendants.

## B.   Prejudice to Plaintiffs of Denying the Amendment

Plaintiffs argue that they would have to pursue parallel state court litigation against the City and the Conservancy if the court

---

[44]UPRC's Response, Docket Entry No. 42, pp. 11-12 ¶ (a)(i).

denies their Motion to Amend.[45]   UPRC responds that Plaintiffs will not be prejudiced because they can pursue their claims against the City and the Conservancy and because those claims are not viable.[46]

If the court denied Plaintiffs' Motion to Amend, they would have to pursue their proposed claims in a parallel state court action.   As explained above, the court is persuaded that Plaintiffs can allege a plausible claim against the Conservancy.   Parallel proceedings would waste the parties' and the courts' resources through duplicative litigation of overlapping issues.   And because two juries might apportion fault differently among the parties, Plaintiffs' ability to recover could be impaired by inconsistent results.   This factor weighs in favor of granting Plaintiffs' Motion to Amend.

## C.   Plaintiffs' Delay

The parties disagree whether Plaintiffs have been dilatory in seeking leave to amend.   The parties agree on the relevant length of time — from filing of the action until filing of Plaintiffs' Motion to Amend, excluding the time that the case was on appeal. Plaintiffs' delay was therefore about three months.   The parties cite cases involving similar delays.   Some courts have found delays of three to six months dilatory, and others have not.   Compare Kingdom Group Investments v. Lakeview Loan Servicing, LLC, Civil

---

[45]Plaintiffs' Motion to Amend, Docket Entry No. 36, pp. 28-29.

[46]UPRC's Response, Docket Entry No. 42, p. 19.

-24-

Action No. 4:22-cv-830-SDJ-KPJ, 2023 WL 7105696, at *4 (E.D. Tex. Sept. 1, 2023), report and recommendation adopted as modified, 2024 WL 1559286 (E.D. Tex. April 10, 2024) (four months was not dilatory), with Ward v. USF&G Specialty Insurance Co., Civil Action No. H-10-0799, 2010 WL 11579445, at *6 (S.D. Tex. Sept. 10, 2010) (four months was dilatory). The court concludes that Plaintiffs have not been dilatory. The court granted UPRC summary judgment just four months after Avery's death, and Plaintiffs sought leave to amend two days after the case was remanded by the Fifth Circuit. Moreover, UPRC does not persuasively articulate how it was prejudiced by the three-month delay. This factor weighs in favor of granting Plaintiffs' Motion to Amend.

## D.   Other Factors Weighing on the Equities

Finally, UPRC argues that this court is already familiar with the facts and legal issues and is therefore best positioned to efficiently resolve the claims against UPRC. But the court's summary judgment ruling only addressed one element of Plaintiffs' claims against UPRC, and Plaintiffs seek to allege a premises-liability claim against UPRC and to add substantial detail to their other claims against UPRC. This factor is outweighed by the other Hensgens criteria. The court will therefore grant Plaintiffs' Motion to Amend.

## IV.   Conclusion and Order

Plaintiffs can allege a plausible claim against the Conservancy, Plaintiffs have not been dilatory in seeking

amendment, and denying leave to amend would prejudice Plaintiffs with parallel litigation and the possibility of inconsistent results.    Plaintiff's Motion for Leave to Amend the Complaint (Docket Entry No. 36) is therefore **GRANTED**, and this action is **REMANDED** to the 215th Judicial District Court of Harris County, Texas.

The clerk will provide a copy of this Memorandum Opinion and Order to the District Clerk of Harris County, Texas.

**SIGNED** at Houston, Texas, on this 23rd day of April, 2023.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE